UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
JOHN DAVIS,

               Plaintiff,                                MEMORANDUM
                                                    AND ORDER

     -against-

                                                   13 CV 6260 (RML)

THE CITY OF NEW YORK, *et al.*,

               Defendants.
-------------------------------------------------X
LEVY, United States Magistrate Judge:

        This case is before me on consent of the parties.  (See Consent to Magistrate

Judge Jurisdiction, filed June 4, 2015, Dkt. No. 15.)  Defendants City of New York, Sergeant

William Sommer, Detective Steve LaFortune, and Sergeant Salvatore Dilapi ("defendants")

move for summary judgment.  For the reasons stated below, defendants' motion is granted.

**BACKGROUND AND FACTS**

        This case arises from the robbery of plaintiff John Davis ("plaintiff") at the E&M

Deli in Brooklyn, New York on February 3, 2011, allegedly by Sergeant William Sommer and

Detective Steve LaFortune of the N.Y.P.D.[1]  The other defendants are the City of New York and

Sergeant Salvatore DiLapi, who led the N.Y.P.D. Internal Affairs Bureau's investigation of

plaintiff's allegations.  The undisputed facts are as follows:

**A.  The Robbery**

        On February 3, 2011 between 5:30 and 6:00 p.m., plaintiff arrived at the E&M

Deli, a convenience store located at 231 Malcolm X Boulevard in Brooklyn, New York and

---

[1]  Plaintiff's opposition papers allege for the first time the involvement of Detective John Edgar, who was on duty with Sommer and LaFortune on the night of the robbery but is not named in the complaint.  (See Plaintiff's Memorandum of Law in Opposition to Summary Judgment, dated Feb. 24, 2020, Dkt. No. 131, at 2, 12-13, 16-20.)

within the 81st police precinct.  (Defendants' Rule 56.1 Statement, dated Jan. 10, 2020 ("Defs.'

56.1"), Dkt. No. 126, ¶¶ 1-3, 5.)  He was carrying approximately $4,000 in cash on his person, a

portion of which was from his recently cashed Veterans Affairs check and a portion of which

was rent money that he had collected from his tenant.  (Id. ¶ 6; Plaintiff's Rule 56.1

Counterstatement, dated Feb. 24, 2020 ("Pl.'s Counter 56.1"), Dkt. No. 132, ¶ 189.)  As plaintiff

walked from his car to the door of the deli, he noticed two men emerge from a van that was

double-parked on Malcolm X Boulevard.  (Defs.' 56.1 ¶ 4.)

       Upon entering the deli, plaintiff got in line to buy a lottery ticket.  (Id. ¶ 7.)  As he

waited in line, the same two men that he had seen exiting the van entered the store and

approached him.  (Id. ¶ 8.)  They tapped him on the shoulder and instructed him to accompany

them to the back of the store; he went with them.  (Id. ¶¶ 9-10.)  Plaintiff and several

eyewitnesses suspected the men were police officers based on their conduct and certain

statements they made,[2] though the men were dressed in plain clothes and at no point identified

themselves as police officers.  (See id. ¶¶ 12-13; Pl.'s Counter 56.1 ¶¶ 192-196, 221.)

       Upon reaching the back of the store, the two men asked plaintiff if he was dealing

drugs, to which plaintiff replied in the negative.  (Defs.' 56.1 ¶ 14.)  The taller of the two men

then searched plaintiff's pockets, retrieving plaintiff's identification and the $4,000 in cash that

plaintiff was carrying.  (Id. ¶¶ 15-17.)  He handed plaintiff's identification to the shorter man,

---

[2] Alberto Hernandez, the manager of the deli, testified in a sworn affidavit that the taller of the
two men showed him a shield and asked him if plaintiff was "running numbers."  (See Affidavit
of Alberto Hernandez, sworn to Nov. 7, 2017, Dkt. No. 130-5.)  William Dunn, a customer,
similarly described the men as "plain clothes police officers."  (See Affidavit of William Dunn,
sworn to Nov. 9, 2017, Dkt. No. 130-13.)  Francisco Sanz, a deli employee, stated in a recorded
interview that he overheard the taller man telling plaintiff, "You're lucky I'm not arresting you.
I'm gonna give you a break."  (Francisco Sanz Interview Transcript, dated Feb. 15, 2011, Dkt.
No. 130-7, at 3:1-2.)

who left the deli and returned to the van.  (Id. ¶ 16.)  While waiting for the shorter man to return, the taller man counted the money.  (Id. ¶ 17.)  He asked plaintiff why he was carrying such a large amount of money and if was acting as a "runner."  (Id. ¶ 18.)

Shortly thereafter, the shorter man returned and the two men spoke privately.  (Id. ¶ 19.)  Once they had finished speaking, the taller man returned plaintiff's identification and one stack of money, totaling approximately $2,600.  (Id. ¶ 20.)  The taller man kept the other stack, totaling approximately $1,400.  (Id.)  The taller man then indicated to plaintiff that he could leave.  (Id. ¶ 21.)  Plaintiff returned to his vehicle and left the scene.  (Id. ¶ 22.)  The entire encounter lasted approximately twenty-five to thirty minutes.  (Id. ¶ 23.)

**B.  The IAB Investigation**

At approximately 6:09 p.m. on the night of the robbery, plaintiff called 911 and reported that he had been robbed by two men whom he believed to be police officers.  (Id. ¶ 25.)  The 911 operator connected him to the N.Y.P.D.'s Internal Affairs Bureau ("IAB").  (Id. ¶ 26.)  Plaintiff told the IAB representative that the men who robbed him were both Hispanic, one of them heavy-set and the other approximately 5'10"-5'11."  (Id. ¶ 27.)  He described their vehicle as a red van.  (Id. ¶ 39.)  He stated that he did not know if the men were police officers, but that he had observed a pair of handcuffs hanging from the clothing of one of the men.  (Id. ¶ 28.)  He further stated that he did not observe any guns, shields, or radios on either of the men.  (Id. ¶ 29.)  His complaint was referred to IAB investigatory group 31, which covered the geographic area in which the robbery had taken place.  (Id. ¶ 30.)

1.  Interviews with Plaintiff and Francisco Sanz – February 3, 2011

At approximately 8:30 p.m., IAB Sergeant Joseph Profeta contacted plaintiff and requested to meet in person for an interview.  (Id. ¶ 31.)  Later that night, Profeta and Sergeant

3

Brian Denis interviewed plaintiff at the deli.  (Id. ¶ 32.)  Plaintiff described the two men who had robbed him as follows: (1) white, possibly "Spanish," and approximately 5'6"; (2) white and approximately 5'10."  (Id. ¶ 33.)  He again described their vehicle as a red van.  (Id. ¶ 40.) Profeta and Denis also interviewed Francisco Sanz, a deli employee who had been working at the time of the robbery.  (Id. ¶ 35.)  Sanz described the men who had robbed plaintiff as follows: (1) white and approximately 5'6"; (2) white, possibly Puerto Rican, and approximately 6'0."  (Id. ¶ 36.)  Like plaintiff, Sanz described the perpetrators' vehicle as a red van.  (Id. ¶ 38.)  He stated that the taller of the men had spoken to him while they were in the store, asking if he knew plaintiff and if plaintiff was "running numbers."  (Id. ¶ 37.)

After concluding the interviews, Profeta and Denis took plaintiff to view the vans that the 81st precinct had been using that day.  (Id. ¶ 42.)  There were two red vans in the parking lot, one of which belonged to the Brooklyn North Narcotics Tactical Response Unit and the other of which belonged to the 81st Precinct Narcotics Module.  (Id. ¶ 43.)  Plaintiff stated that he was "not sure which one of the vans stopped him" but believed that "the van that stopped him was the same color" as the vans in the lot.  (Id. ¶ 44; IAB File, Dkt. No. 130-3, at NYC 94.)

2.  Photo Array – February 4, 2011

On February 4, 2011, Profeta reviewed the roll calls for the 81st Precinct Narcotics Module and the Brooklyn North Narcotics Tactical Response Unit, the two units that had been assigned red vans the day before, and created a photo array of all white and Hispanic officers who had been working that day.  (Id. ¶ 49.)  At 6:00 p.m., he met with plaintiff and Sanz at the deli to view the photo array.  (Id. ¶ 50.)  Neither plaintiff nor Sanz identified anyone.  (Id. ¶ 51.)  This photo array did not include photos of Sommer, La Fortune, or Edgar.  (See IAB File at 89-90.)

4

3.  <u>Follow-Up Investigation by DiLapi – February 15,  2011</u>

On February 9, 2011, plaintiff's complaint was transferred to IAB group 41 and

DiLapi was assigned to lead the investigation.  (Def.'s 56.1 ¶ 52.)  On February 15, 2011, DiLapi

re-interviewed Sanz.  (<u>Id.</u> ¶ 53.)  During that interview, Sanz described the vehicle used by the

perpetrators as a black Ford F150.  (<u>Id.</u> ¶ 54.)  He also added to his prior description of the two

men, noting that: (1) the shorter man was white, approximately 5'6" and 220 lbs., and had a short

haircut; (2) the taller man was Hispanic, approximately 5'10" and 200 lbs., with short black curly

hair and a goatee.  (<u>Id.</u> ¶ 55.)  He stated that the men did not identify themselves as police

officers, though at other points in the interview he referred to them as "officers."  (<u>See id.</u> ¶ 56;

Plaintiff's Rule 56.1 Responses, dated Feb. 24, 2020 ("Pl.'s 56.1 Resp."), Dkt. No. 132, ¶ 56; <u>see</u>

<u>also</u> Francisco Sanz Interview Transcript, dated Feb. 15, 2011, Dkt. No. 130-7.)

4.  <u>Search for Video Footage</u>

The deli did not have functioning security cameras at the time of the robbery.

(Defs.' 56.1 ¶¶ 57-58.)  On February 15, 2011, DiLapi conducted a canvass of the surrounding

neighborhood and identified two buildings with external security cameras; however, he was

unable to recover footage from either building.   (<u>Id.</u> ¶¶ 59-63.)

5.  <u>Photo Arrays – February 17, 2011 and March 1, 2011</u>

On February 17, 2011, DiLapi returned to the deli to show Sanz a photo array of

all officers comprising the 83rd precinct's Street Narcotics Enforcement Unit and Crime teams.

(<u>Id.</u> ¶ 64.)  Sanz did not make an identification.  (<u>Id.</u>)  This array did not include photos of

Sommer, La Fortune, or Edgar.  (<u>See</u> Pl.'s Counter 56.1 ¶ 228.)  On March 1, 2011, DiLapi

showed plaintiff the same photo array he had shown Sanz.  (Defs.' 56.1 ¶ 65.)  Plaintiff did not

make an identification either.  (<u>Id.</u>)

6.  <u>Sherell Carter's Identifications and Interview</u>

During the March 1, 2011 interview, plaintiff told DiLapi that a female

eyewitness (now known to be Sherell Carter) had told him that she knew the names of the men

who had robbed him because they had arrested her sister, Deborah, in the past.  (<u>Id.</u> ¶¶ 66-67.)

He could not recall the eyewitness's name, but told DiLapi he had spoken with Deborah, who

told him that one of the officers was named "Pete Edwards."  (<u>Id.</u> ¶¶ 67-68.)  DiLapi conducted a

search of the N.Y.P.D. directory, which revealed no officer named Pete Edwards.  (<u>Id.</u> ¶ 69.)

On March 8, 2011, plaintiff called the IAB group investigating his complaint and stated that the

female eyewitness was named Sherell Carter.  (<u>Id.</u> ¶ 70.)  He also provided Carter's phone

number.  (<u>Id.</u>)  Plaintiff stated that Carter had told him that the names of the officers who robbed

him were LaFortune and Sommer, and that Carter knew their names because they had arrested

her in the past.  (<u>Id.</u> ¶¶ 71-72.)

Later that day, DiLapi called Carter to arrange for an interview.  (<u>Id.</u> ¶ 73.)

During that call, Carter described the men who had robbed plaintiff as "light-skinned males" and

stated that she had seen them exit a white van and follow plaintiff into the deli.  (<u>Id.</u> ¶¶ 74-75.)

She agreed to meet DiLapi for an in-person interview the following day.  (<u>Id.</u> ¶ 76.)  The parties'

papers do not indicate whether this interview occurred and the court could find no record of it.

On March 26, 2011, DiLapi called Carter again to attempt to set up an in-person interview;

however, Carter would only agree to speak over the phone.  (<u>Id.</u> ¶ 77.)  During the March 26th

call, Carter described the perpetrators as two white males, and again stated that she had seen

them exiting a white van prior to entering the deli.  (<u>Id.</u> ¶¶ 78-79.)  Without giving their names,

she stated that she knew who the men were because she had seen them arresting someone on

Putnam Avenue in Brooklyn on the day following the incident.  (<u>Id.</u> ¶ 80.)  She stated that she

had their names written down in a book, which she did not have with her at the time.  (Id. ¶ 81.)

DiLapi attempted on numerous occasions to set up a follow-up interview, but Carter became

unresponsive.  (See id. ¶¶ 82-84.)

       7.  Investigation of Sommer and LaFortune

      Based on plaintiff's report of what Carter had told him regarding the officers'

names, DiLapi searched the N.Y.P.D. database and determined that Sommer and LaFortune were

assigned to the Narcotics Borough Brooklyn North – 083 ("NBBN-083") team on the date of the

robbery.  (Id. ¶¶ 85-86.)  He reviewed the vehicle rosters for the NBBN-083 team and

determined that the only unmarked van assigned to that team on the robbery date was a silver

Ford cargo van.  (Id. ¶ 87.)

      LaFortune is a dark-skinned black male; Sommer is a white male with blue eyes

and blond hair.  (Id. ¶¶ 88-89.)  Per their NYPD profiles as of the time of the robbery, LaFortune

was 5'9" and weighed approximately 230 pounds; Sommer was 6'0" and weighed approximately

195 pounds.  (Id. ¶¶ 90-91.)  DiLapi does not know Sommer or LaFortune, and neither Sommer

nor LaFortune knows DiLapi.  (Id. ¶¶ 92-94.)  DiLapi chose not to interview either Sommer or

LaFortune during his investigation because LaFortune did not match any of the various

descriptions plaintiff had given of the perpetrators.  (Id. ¶ 95.)

       8.  Photo Arrays June 3 and July 2, 2011

      On June 3, 2011, DiLapi showed plaintiff a photo array of all officers working on

the robbery date in Brooklyn North who were assigned to a red, white, or black van.  (Id. ¶ 96.)

This was the first photo array to include photos of Sommer and LaFortune.  (See id. ¶ 98.)

Plaintiff did not make an identification.  (Id. ¶ 99.)  On July 2, 2011, DiLapi showed Sanz the

same photo array.  (Id. ¶ 101.)  Sanz did not make an identification either.  (Id. ¶ 103.)

9.  <u>Officers' Activities at the Time of the Robbery</u>

On September 23, 2011, DiLapi reviewed memo book entries for all members of NBBN-083 on the date of the robbery, including Sommer and LaFortune.  (<u>Id.</u> ¶ 104.)  Both officers' memo book entries indicate that at 5:30 p.m. they were on their way to meet a confidential informant, along with Edgar.  (<u>See id.</u> ¶¶ 105, 110.)  The memo books further indicate that by 6:30 p.m. the confidential informant had joined them in their vehicle and the entire group was headed to a location on Eldert Street in Brooklyn.  (<u>Id.</u> ¶¶ 106, 112.)  Edgar's memo book entries match Sommer's and LaFortune's.  (<u>See id.</u> ¶ 17.)

During the course of this litigation, Sommer and LaFortune submitted affidavits as to their activities on the night of the robbery.  LaFortune's affidavit states: "[b]etween the hours of 5:30 p.m. and 7:30 p.m., Sergeant Sommer and I met with the aforementioned confidential informant in our vehicle and subsequently drove to 43 Eldert Street in Brooklyn, N.Y."  (<u>Id.</u> ¶ 108; <u>see also</u> Affidavit of Steve LaFortune, sworn to Aug. 3, 2016 ("LaFortune Aff."), Dkt. No. 127-5, ¶ 6.)  Sommer's affidavit gives an identical account.  (<u>See</u> Def.'s 56.1 ¶ 114; Affidavit of William Sommer, sworn to Aug. 8, 2016 ("Sommer Aff."), Dkt. No. 127-6, ¶ 6.)

There is some dispute over the extent to which the affidavits corroborate the memo books.  While Sommer and LaFortune each state that their affidavits attest to "the same information contained in [their] memobook[s]" (<u>id.</u> ¶¶ 107, 113), plaintiff claims that the two accounts are inconsistent because, while the memo books indicate that the officers began their drive to Eldert Street at 6:30 p.m., the affidavits imply that they did not depart for Eldert Street until after 7:30 p.m..  (Pl.'s 56.1 Resp. ¶¶ 109, 113.)  The affidavits additionally state that, on the

night of the robbery, the officers were traveling in a gray Mitsubishi SUV.  (See LaFortune Aff. ¶ 7; Sommer Aff. ¶ 7.)

 10. Disposition of the IAB Complaint

 In September 2011, DiLapi recommended that plaintiff's IAB investigation be closed with a disposition of "unsubstantiated."  (Defs.' 56.1 ¶ 120.)  Multiple levels of senior officials reviewed DiLapi's investigation report and approved the disposition of unsubstantiated. (Id. ¶ 121.)  Plaintiff was notified of the disposition by letter.  (Id. ¶ 122.)

**C. The Instant Litigation**

 1. Identification of Major and Galasso

 Plaintiff filed the complaint in this case on November 13, 2013.  (Id. ¶ 123; see also Complaint, dated Nov. 12, 2013 ("Compl."), Dkt. No 1.)  On December 22, 2014, he reviewed a photo array at the Corporation Counsel's office, accompanied by his then-attorney. (Defs.' 56.1 ¶ 124.)  From that photo array, he identified two individuals: Officer Kevin Major and Sergeant Frank Galasso.[3]  (Id. ¶¶ 125-127.)  Neither Major nor Galasso was working in Brooklyn on the date of the robbery—Major was working in the Bronx and Galasso has been on desk duty since March of 2000.  (Id. ¶¶ 128-130.)

 2. Identification of Shannon and Motion to Amend

 At some point during the summer of 2011, plaintiff spotted a man driving a blue BMW, whom he recognized as being the taller of the two men who had robbed him.  (Id. ¶ 131.)

---

[3] Plaintiff claims that the veracity of this photo array is in dispute because he "believes the tag numbers on the photos he was shown were switched, confusing his identification and rendering the evidence unreliable."  (Pl.'s 56.1 Resp. ¶¶ 125-127.)  He does not explain the basis of this assertion and cites only to his own similarly vague statements to the same effect, made during a 2015 telephone conference.  (See id.; Transcript of Telephone Conference, dated Sept. 24, 2015, Dkt. No. 49, at 12:16-25; 15:5-11.)  This is insufficient to create a factual dispute.  See Local Civil Rule 56.1(d) (requiring the opponent of a motion for summary judgment to point to admissible evidence in the record in order to create a dispute of fact).

He stated during his deposition that he was sure of this identification because "someone standing up next to me that long and going in my pocket . . . I could never forget who this person really is. We were standing there a long time. . . . " (Id. ¶ 132; John Davis Deposition Transcript, dated Feb. 2, 2016 ("Davis Dep. Tr."), Dkt. No. 127-2, at 126:11-16.)  Plaintiff followed the man into the parking lot of the 81st precinct, where the man exited his vehicle and went inside.  (Defs.' 56.1 ¶ 133.)  Plaintiff then wrote down the BMW's license plate number.  (Id. ¶ 134.)  In approximately 2013, he gave the license plate number to his attorney, who conducted a search of New York's DMV records and discovered that the BMW was registered to Officer Darrell Shannon of the 81st precinct.  (Id. ¶¶ 135-36.)

On April 30, 2015, plaintiff moved to amend the complaint to add Shannon as a defendant, with a letter brief filed in support on July 9, 2015.[4]  (Id. ¶¶ 137-138; see also Letter Brief, dated July 9, 2015 ("Ltr. Br."), Dkt. No. 18.)  In the July 9 letter brief, plaintiff's then-attorney, Scott Cerbin, stated that plaintiff had been provided "incorrect information [] by one of the eyewitnesses to the robbery that William Sommer, Steve LaFortune, and an officer with the last name Edwards were among the individuals who robbed [plaintiff]."  (Defs.' 56.1 ¶ 139; Ltr. Br. at 1-2.)  He went on to state that "[b]ased on an interview my co-counsel conducted with the eyewitness to the incident who provided the names to Mr. Davis, as well as the discovery provided to us by the defendants, it became clear that LaFortune, a dark-skinned male, had been incorrectly named as a defendant in the action."  (Defs.' Rule 56.1 ¶ 140; Ltr. Br. at 3.)  Cerbin

_____

[4] Defendants state that the motion sought to *replace* Sommer and LaFortune with Shannon. (Defs.' 56.1 ¶ 138.)  Plaintiff disputes this characterization, stating that he merely sought to *include* Shannon as a defendant in addition to Sommer and LaFortune.  (Pl.'s 56.1 Resp. ¶ 138.) While no proposed amended complaint was submitted, it bears noting that the motion states that Sommer and LaFortune were incorrectly named.  (See Letter Brief, dated July 9, 2015, Dkt. No. 18.)

argued that good cause existed under FED. R. CIV. P. 15(c)(3) to allow plaintiff to amend his

complaint and referred to the naming of Sommer and LaFortune as "a mistake."  (See Defs.' 56.1

¶¶ 141-143; Ltr. Br. at 5-7.)

On August 11, 2015, I ordered the City to arrange for a photo array including

photos of Shannon and his assigned partner on the date of the robbery.[5]  (Defs.' 56.1 ¶ 144;

Minute Entry, dated Aug. 11, 2015.)  That photo array took place on August 26, 2015.  (Defs.'

Rule 56.1 ¶ 145.)  Plaintiff did not identify anyone.[6]  (Id. ¶ 146.)

At a conference held on September 24, 2015, I granted Mr. Cerbin's motion to

withdraw as counsel on the basis of an irreconcilable conflict with plaintiff.  (Id. ¶ 147; Minute

Entry, dated Sept. 24, 2015.)  My minute entry stated in relevant part:

> Mr. Cerbin has moved orally to withdraw as counsel, as he
> believes there is no viable basis for the pending motion to amend
> to add Officer Shannon, as plaintiff has not been able to identify
> him in a photo array and he did not match the description plaintiff
> originally provided of the perpetrator.  Similarly, counsel advises
> that there is no factual support for adding #2 or #6 [Major and
> Galasso] as defendants. He believes, and I agree, that he and his
> client now have an irreconcilable conflict.

(Minute Entry, dated Sept. 24, 2015.)  Mr. Cerbin's co-counsel later made an identical motion,

which I also granted.  (Defs.' 56.1 ¶ 151; Order, dated Oct. 1, 2015.)  On November 12, 2015, I

terminated the motion to amend with leave to renew, as plaintiff was unable to identify Shannon

in a photo array or provide any evidence of his involvement.  (Defs.' 56.1 ¶ 152; Order, dated

Nov. 12, 2015.)

---

[5] My order specified that the photo array should be shown to "plaintiff and the nonparty
eyewitness," though there is no indication that it was ever shown to Carter.

[6] As with the identifications of Major and Galasso, plaintiff again disputes the veracity of the
photo array based on his belief that the tag numbers were switched but fails to cite to any
admissible evidence in the record to support that assertion.  (See Pl.'s 56.1 Resp. ¶ 146.)

3.   Plaintiff's Deposition

At his deposition on February 2, 2016, plaintiff again provided descriptions of the men who had robbed him.  (See Defs.' 56.1 ¶¶ 155-160.)  He described the shorter of the two men as approximately 5'5" and looking "Spanish," going on to explain that "[h]e could have been white, you know, whatever, light complexion."  (Id. ¶ 155; Davis Dep. Tr. at 91:8-12.)  He additionally described the shorter man as "short, chubby, fat-like, you know, a little."  (Defs.' 56.1 ¶ 156; Davis Dep. Tr. at 122:20-23.)  He described the taller man as approximately 6'0" and stated that "he looked Indian or he had that brownish complexion of an Indian.  He could have been Spanish, I am not sure, and he was a little bit taller."  (Defs.' 56.1 ¶ 157; Davis Dep. Tr. at 91:13-16.)  He later stated that the taller man "appeared to be Spanish, Indian, or West Indian." (Defs.' 56.1 ¶ 158; Davis Dep. Tr. at 122:17-19.)  He additionally stated that the taller man had short hair with a receding hairline and a "brownish" complexion, and that "he looks Oriental to me, because – he could have been Indian or Spanish."  (Defs.' 56.1 ¶ 159; Davis Dep. Tr. at 121:9-122:9.)  When asked if the taller man appeared to be Caucasian, plaintiff said "No, he wasn't.  He didn't appear to be Caucasian."  (Defs.' 56.1 ¶ 160; David Dep. Tr. at 122:10-11.)

Plaintiff was additionally presented with his responses from the December 22, 2014 photo array and affirmed his identifications of Major and Galasso as the men who robbed him.  (Defs.' 56.1 ¶¶ 161-162; Davis Dep. Tr. at 163:6-166:22.)  Specifically, he identified Major as the shorter man and Galasso as the taller man.[7]  (See id.)

4.   Carter's Testimony

i.   *Carter's Affidavit*

---

[7] Plaintiff once more disputes his identifications of Major and Galasso based on his belief that the tag numbers were switched.  For the reasons explained above, his objection is insufficient to create a factual dispute.

On January 1, 2017, plaintiff filed an affidavit by Sherell Carter, dated November 26, 2016.  (Defs.' 56.1 ¶ 165; Affidavit of Sherell Carter, dated Nov. 26, 2016 ("Carter Aff."), Dkt. No. 68.)  Carter's affidavit states that on February 3, 2011 at approximately 5:30 p.m., she was shopping at the deli when she observed two white males approach plaintiff and search him in the back of the store.  (Defs.' 56.1 ¶ 166; Carter Aff. ¶¶ 1-6.)  Her affidavit further states that, on the day following the robbery, February 4, 2011, she observed the same two men "dressed as police officers."  (Defs.' 56.1 ¶ 167; Carter Aff. ¶ 11.)  The affidavit does not identify the men by name.  (Defs.' 56.1 ¶ 168; see Carter Aff.)

## ii.  *Carter's Deposition*

During her deposition on July 24, 2017, Carter testified that she did not know, and has never known, the names or badge numbers of the men who robbed plaintiff, though she stated she would know them "by face."  (Defs.' 56.1 ¶ 169; Sherell Carter Deposition Transcript, dated July 24, 2017 ("Carter Dep. Tr."), Dkt. No. 127-9, at 43:6-44:21, 55:7-11.)  Carter described the shorter of the two men who robbed plaintiff as white, short ("five-something"), stocky, and bald.  (Defs.' 56.1 ¶ 170; Carter Dep. Tr. at 28:24-29:22, 31:4-14.)  She initially described the taller man as approximately 6'0" and Hispanic, though she later stated "they were both white cops."  (Id.)  Carter testified that the first time she had seen either of the two men was when they approached plaintiff in the deli, but that she saw them later that evening, at approximately 8:00 p.m., conducting a raid on Putnam Avenue along with other officers from the 81st precinct.[8]  (Defs.' 56.1 ¶¶ 171-72; Carter Dep. Tr. at 41:11-44:7.)  She also testified that she

_____

[8] Plaintiff does not dispute that Carter testified that she had never seen the shorter man before that evening; however, plaintiff does claim that Carter testified to having seen the taller man on three prior occasions.  (See Pl.'s 56.1 Resp. at ¶ 172.)  When read in context, that is not how I interpret her testimony:

(continued. . . . )

had seen the same two men on the following day, February 4, 2011, in uniform at the 81st

precinct.[9]  (Defs.' 56.1 ¶ 173; Carter Dep. Tr. 111:10-18, 112:18-115:3.)

Both officers' memo books indicate that, from 7:30 p.m. and until at least 9:00

p.m. on February 3, 2011, they were conducting buy and bust operations at various specified

locations.  (See Defs.' 56.1 ¶¶ 178, 180.)  Neither officer's memo book mentions a buy and bust

operation on Putnam Avenue.  (See id. ¶¶ 179, 181.)

**DISCUSSION**

A.  Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A fact

is 'material' for these purposes when it 'might affect the outcome of the suit under the governing

---

> Q: Let's start with the tall, Hispanic one.  How many times had
> you seen him before?
> A. I think I had seen him like three times.
> Q. When was the first time?
> A. *The first time was that day.* And that night, they had – I think
> they did a sweep the same time – the same night.
> Q. So the first time you saw the tall, Hispanic officer?
> A. That was at Hancock and Malcolm X, that night.
> Q. *At the E&M Deli?*
> A. *Yes.*

(Carter Dep. Tr. at 41:14-25 (emphases added)).  Later, the following exchange occurred:

> Q: The tall, Hispanic officer, had you ever seen him prior to that
> day?
> A: No.

(Id. at 43:5-7.)

[9] Carter testified that the reason she went to the 81st precinct on February 4, 2011 was that her nephew had taken her car and been arrested for driving underage, and she needed to retrieve her car keys.  (See Carter Dep. Tr. 112:18-114:16.)

14

law.'"  Rojas v. Roman Cath. Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  No genuine issue of material fact

exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party.  If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (citations omitted).

"Summary judgment allows the court to dispose of meritless claims before becoming entrenched

in a frivolous and costly trial."  Tavares v. City of New York, No. 17 CV 5221, 2020 WL

2563189, at *2 (E.D.N.Y. Apr. 6, 2020) (citing Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d

Cir. 1986)).

      The moving party bears the initial burden of establishing the absence of any

genuine issue of material fact.  See Liberty Lobby, 477 U.S. at 256; Holcomb v. Iona Coll., 521

F.3d 130, 137 (2d Cir. 2008).  This showing can be accomplished by citation to "materials in the

record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  See FED.

R. CIV. P. 56(c). The moving party may show *prima facie* entitlement to summary judgment by

either: (1) pointing to evidence that negates an opponent's claims; or (2) identifying portions of

an opponent's evidence that demonstrate the absence of a genuine issue of material fact.

Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006) (citing Celotex Corp v. Catrett, 477

U.S. 317, 323 (1986) and Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)).  To determine

whether the moving party has carried its burden, the court is required to "constru[e] the evidence

in the light most favorable to the nonmoving party and draw[ ] all inferences and resolv[e] all

ambiguities in favor of the nonmoving party."  Doro v. Sheet Metal Workers' Int'l Ass'n, 498

F.3d 152, 155 (2d Cir. 2007); Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005).

Where the movant shows a *prima facie* entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." Salahuddin, 467 F.3d at 273; accord Miller v. Nassau Health Care Corp., No. 09 CV 5128, 2012 WL 2847565, at *3 (E.D.N.Y. July 11, 2012). "[T]he nonmovant cannot rest on allegations in the pleadings" but rather, "must point to specific evidence in the record to carry its burden on summary judgment," Salahuddin, 467 F.3d at 273, offering "'concrete evidence from which a reasonable juror could return a verdict in its favor,'" Dister v. Cont'l Grp., 859 F.2d 1108, 1114 (2d Cir. 1988) (quoting Liberty Lobby, 477 U.S. at 256). See also McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor."). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In resolving a summary judgment motion, the court must not "weigh evidence or assess the credibility of witnesses." Tavares, 2020 WL 2563189, at *3 (citing United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994)).

B. Federal Claims

Plaintiff brings claims against Sommer and LaFortune under 42 U.S.C. § 1983 for (1) unlawful stop and frisk; (2) unlawful search; (3) unlawful seizure; (4) deprivation of property without due process; and (5) failure to intervene. (See Compl.; Defendants' Memorandum of Law in Support of Motion for Summary Judgment, dated Jan. 10, 2020 ("Defs.' Mem."), Dkt. No. 128, at 2; Plaintiff's Memorandum of Law in Opposition to Summary Judgment, dated Feb. 24, 2020 ("Pl.'s Mem."), Dkt. No. 131.) He additionally brings a claim against Sommer,

16

LaFortune, and DiLapi under 42 U.S.C. § 1985 for conspiracy in connection with the IAB investigation.  (See id.)  He purports to have brought a claim against the City for failure to train, though the complaint does not plead municipal liability.  (See Compl.; Pl.'s Mem. at 31.)

Section 1983 "provides 'a method for vindicating federal rights elsewhere conferred,' including under the Constitution."  Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)).  To sustain a claim brought under Section 1983, "[t]he conduct at issue 'must have been committed by a person acting under color of state law' and 'must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'"  Id. (quoting Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994)).  Moreover, a plaintiff must allege the direct or personal involvement of each of the defendants in the alleged constitutional deprivation.  See Terebesi v. Torreso, 764 F.3d 217, 234 (2d Cir. 2014); Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010); Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006).

A §1985 claim requires plaintiff to show evidence of a conspiracy for the purpose of depriving him of equal protection of the law and an act in furtherance of such conspiracy that caused injury to plaintiff.  See Robinson v. Allstate Ins. Co., 508 F. App'x 7, at 9 (2d Cir. Jan. 22, 2013) (quoting United States Bhd. of Carpenters v. Scott, 463 U.S. 825, 828-29 (1983)). In addition, to serve as a predicate for a §1985 claim, the alleged conspiracy must be motivated by "'some racial or . . . class-based, invidious discriminatory animus.'"  Id. (quoting Britt v. Garcia, 457 F.3d 264, 270 n. 4 (2d Cir. 2006)).

1.  Personal Involvement of Sommer and LaFortune

Defendants' principal argument in support of summary judgment is that all of plaintiff's claims against Sommer and LaFortune fail because he has put forth no evidence that they are the men who robbed him.  (See Defs.' Mem. at 15-23.)  They assert that plaintiff's

17

physical descriptions of the men who robbed him have varied over time and have never accurately described Sommer and LaFortune as a pair.  For example, during plaintiff's first call to the IAB, which occurred immediately after the robbery, he stated that the men who robbed him were both Hispanic.  (Id. at 18.)  Later that same evening, he stated that the men were both white, one possibly "Spanish."  (Id.)  Both Carter and Sanz similarly described the men as white or "light-skinned."  (Id.)  In reality, Sommer is white and LaFortune is black.  (Id. at 19.)  It was not until his deposition, in February 2016, that plaintiff first described one of the men as having darker skin, stating that the taller of the two men had a "brownish complexion" and "didn't appear to be Caucasian."  (Id. at 18-19.)  During that deposition, he also described the lighter skinned man as shorter and "chubby."  (Id. at 19.)  In reality, Sommer is taller and leaner than LaFortune.[10]

     Meanwhile, not only did plaintiff fail to identify Sommer and LaFortune in the June 3, 2011 photo array, but he later identified two different officers (Major and Galasso, neither of whom was working in Brooklyn on the night of the robbery, and one of whom has been on desk duty since 2000) as the men who had robbed him.  (Id. at 20.)  He later identified Shannon as being the taller of the two men who had robbed him, seeking to amend his complaint on the basis that Sommer and LaFortune had been incorrectly named, yet ultimately abandoned that motion after failing to identify Shannon in a photo array.  (Id. at 20-21.)

     Defendants additionally point to a number of inconsistencies in Carter's statements.  For example, when plaintiff first reported to DiLapi that there was an eyewitness

---

[10] Defendants also note inconsistencies in the various descriptions of the perpetrators' vehicle. Plaintiff claims that the men arrived in a red van, whereas Sanz described a black Ford F150 and Carter described a white van.  (Defs.' Mem. at 22.)  In fact, Sommer and LaFortune were traveling in a gray Mitsubishi SUV on the night of the robbery.  (Id.)

who knew the names of the officers, he told DiLapi that the then-unnamed eyewitness knew the officers' names because they had arrested her sister in the past.  (Id. at 17.)  A week later, during the interview where plaintiff first put forth the officers' names and identified the eyewitness as Carter, he stated that Carter knew their names because they had arrested her in the past.  (Id.) When DiLapi spoke with Carter herself, she told him she recognized the men because she had seen them arresting someone on Putnam Avenue on the day following the robbery, but did not volunteer their names.  (Id.)  In her deposition, after testifying that she did not in fact know the men's names, she then said that she had seen them conducting a raid on Putnam Avenue around 8:00 p.m. on the day of the robbery and also that she had seen them the following day at the 81st precinct when she went to collect her car keys.  (Id. at 17-18.)  Defendants argue that Carter's statements should be deemed incredible as a matter of law.  (Id. at 18.)

Recognizing the obvious identification issues, particularly as to LaFortune, plaintiff now argues that it was actually Sommer and *Edgar*[11] who robbed him, though he maintains that LaFortune may still be held liable either as a direct participant or for failure to intervene.  (See Pl.'s Mem. at 24-29.)  Since Edgar is white, plaintiff argues that Sommer and Edgar, as a pair, match his earliest descriptions of the men who robbed him.  (Id. at 24-25.)  He also notes the complaint alleges the involvement of three individuals: Sommer, LaFortune, and an individual with the last name "Edwards," which is similar to "Edgar."  (Id. at 2.)  Edgar's photo was provided to plaintiff in the same photo array that included photos of Sommer and LaFortune, yet plaintiff did not identify him.  (See Defendants' Reply Memorandum of Law, dated Apr. 14, 2020, Dkt. No. 139, at 3.)

---

[11] Edgar is not named in the complaint and plaintiff has not moved to add him as a defendant.

He further argues that the officers' memo books place them in the immediate area of the deli at the time the robbery occurred, noting that the deli is approximately one mile (or a six minute drive, per Google Maps) from 43 Eldert Street, the location where the officers traveled with the confidential informant on the night of the robbery.  (See Pl.'s Mem. at 20-21.) The memo books indicate that Sommer, LaFortune, and Edgar left the 83rd precinct at 5:30 p.m., picked up the confidential informant, and by 6:30 p.m. were on their way to 43 Eldert Street. (Id. at 20.)  Because the memo books indicate that the officers were en route to pick up the confidential informant between 5:30 and 6:30 p.m., without necessarily providing a precise location, plaintiff claims that the memo books "fail to state where [the officers] were located" during the time the robbery was taking place and that this, taken in conjunction with the proximity of the deli to 43 Eldert Street, "gives rise to the reasonable inference that the officers were present at the E&M Deli and surely generates a genuine issue of material fact concerning their participation in the robbery."  (Id. at 20-21.)

Plaintiff also points to inconsistencies between the memo books, which state that the officers had picked up the confidential informant and were heading to 43 Eldert Street by 6:30 p.m., and the officers' declarations, which state that they met with the confidential informant "[b]etween the hours of approximately 5:30 PM and 7:30 PM" before departing for 43 Eldert Street, arguing that "[t]his hour long conflict in time provides more than ample time for the officers to both rob Mr. Davis and meet with their confidential informant, especially in light of the physical proximity of the E&M Deli to the officers' reported whereabouts."  (Id. at 21-22.) He then argues that the record contains evidence that the memo books were revised after the fact, noting that Sommer had initially indicated that he was going to meet with a different confidential informant than LaFortune, but later scratched out that informant's identification number and

20

replaced it with a number that matched what LaFortune had recorded.[12]  (Id. at 22-23.)  Since there is no way to tell from the memo books themselves when information was recorded, plaintiff asserts that "a reasonable fact finder could infer that alterations were made after February 3, 2011 to create a consistent record" and that "because the 81st and the 83rd precinct share a radio channel, the officers could have heard Plaintiff's 911 call reported on their police radios and sought to ensure that their memobooks were consistent in advance of any IAB inquiry."  (Id.)

Plaintiff's arguments contain a great deal of speculation, but plaintiff has put forth virtually no hard evidence linking Sommer and LaFortune to the robbery.  The strongest piece of evidence in plaintiff's favor is the fact that Carter, an eyewitness, allegedly told plaintiff the officers' names.  In their briefs, the parties frame this as a credibility issue, with plaintiff arguing that it would be improper to weigh Carter's credibility on summary judgment (Pl.'s Mem. at 16) and defendants arguing that Carter's testimony should be deemed incredible as a matter of law (Defs.' Mem. at 18).

While Carter was the supposed source of *plaintiff's* knowledge of the officers' names, she has not personally proffered their names in the course of this litigation.  When DiLapi interviewed Carter on March 26, 2011, she described the men and their vehicle but did not provide their names.  (See Defs.' 56.1 ¶¶ 78-81.)  Instead, she claimed that she had their names written down in a book detailing the names of officers with whom she interacts on the street, but that she did not have the book with her at the time.  (See id. ¶ 81; IAB File at NYC62.)  She further did not provide the officers' names in her affidavit, nor did she claim to know them.  (See

---

[12] Sommer testified at his deposition that he had recorded the wrong confidential informant number and had crossed it out to write in the correct number.  (Defs.' 56.1 ¶ 111; William Sommer Deposition Transcript, dated Oct. 30, 2019, Dkt. No. 127-20, at 53:15-54:3.)

Carter Aff.)  When deposed, she testified that she did not know, and has never known, the officers' names.[13]  (Def.'s 56.1 ¶ 169; Carter Dep. Tr. at 55:7-11.)  Therefore, if the only evidence in the record linking these officers to the robbery is plaintiff's hearsay statement that Carter told him that they were the men who robbed him, then the issue at the heart of the identification dispute is less a credibility issue and more an admissibility issue.

A party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment, absent a showing that admissible evidence will be available at trial."  Burlington Coat Factory Warehouse Corp. v. Espirit De Corp., 769 F.2d 919, 924 (2d Cir. 1985) (citations omitted); see also Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (noting that "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and the Federal Rules of Evidence govern such admissibility).  It is true, as plaintiff contends, that hearsay statements contained in police reports and IAB files are generally admissible on summary judgment as public records under Federal Rule of Evidence 803(8).  See FED. R. EVID. 803(8)(A) (providing an exception to the rule against hearsay where the "record or statement" made by a "public office" sets out "the office's activities" and, "in a civil case," the record or statement reflects "factual findings from a legally authorized investigation.");  Cooper v. City of New Rochelle, 925 F. Supp. 2d 588, 605 (S.D.N.Y. 2013) (finding police

---

[13] Plaintiff argues that Carter's inability to recall the names in 2017 does not demonstrate that she did not know the names in 2011.  (Pl.'s Mem. at 18.)  However, Carter did not merely testify to an inability to remember the names; she testified that she never knew them:

> Q: As you sit here today, do you know the names of the officers
> who approached plaintiff in the deli?
> A. No.
> Q: At any time did you know their names?
> A. No.

(Carter Dep. Tr. at 55:7-11.)

report admissible on summary judgment as a public record).  However, this only applies if the evidence in question "will be presented in admissible form at trial."  Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam); see also Smith v. City of New York, 697 F. App'x 88, 89 (2d Cir. 2017) (stating police documents were properly considered on summary judgment where they "could readily be reduced to admissible form at trial through the testimony of the defendant officers as to the underlying events in question.").  Plaintiff maintains that Carter's alleged statements to plaintiff, which he repeated to the IAB investigators, do not constitute hearsay under Federal Rule of Evidence 801(d)(1)(C) because he intends to call Carter to testify at trial, where she will be subjected to cross-examination.  (See Letter of Elizabeth V. Young, Esq., dated Feb. 10, 2021, Dkt. No. 147.)  However, when called to testify under oath at her deposition, Carter stated that she did not know the officers' names *and never had*.  (Carter Dep. Tr. at 54:19, 55:7-11.)  There is no evidence in the record to suggest that Carter ever uttered the names Sommer and LaFortune to anyone at any time, except for plaintiff's statement that she did so in a private conversation with him.  Not once did Carter identify them directly to the IAB.

Carter's alleged statement to plaintiff is classic hearsay—an out-of-court statement offered for the truth of the matter asserted (see FED. R. EVID. 801(c))—and cannot be considered on summary judgment.  That plaintiff included it in his statement to DiLapi does not remove it from that category.  Although plaintiff claims that he will call Carter to testify at trial, he has put forth no reason to conclude that Carter would testify inconsistently with her sworn deposition testimony.  The identification is therefore inadmissible, and without it, plaintiff cannot raise a triable issue of fact.

2.  Due Process

While the complaint makes only vague and conclusory references to due process,[14] defendants note that the court "may recognize" a procedural due process claim for deprivation of property if "liberally construing the Complaint."  (See Compl.; Defs.' Mem. at 2.) In the event that the court recognizes such a claim, they argue that it fails for the additional reason that adequate post-deprivation remedies were available at state law.  (See Defs.' Mem. at 24-25.)

A deprivation of property without due process, whether negligent or intentional, does not give rise to a claim under § 1983 so long as state law provides for an adequate post-deprivation remedy and the deprivation was the result of "random and unauthorized" conduct. David v. N.Y.P.D. 42nd Precinct Warrant Squad, No. 02 CV 2581, 2004 WL 1878777, at *5 (S.D.N.Y. Aug. 23, 2004) (citing Butler v. Castro, 896 F.2d 698, 700 (2d Cir. 1990) (finding adequate post-deprivation remedy is defense to § 1983 claim based on "random and unauthorized" deprivation but not to claim "where the deprivation complained of results from the operation of established state procedures")); see also Hudson v. Palmer, 468 U.S. 517, 533 (1984) (finding intentional deprivation of property not actionable under § 1983 if meaningful

---

[14] "As a direct and proximate result of the acts of defendants, plaintiff suffered the following injuries and damages:

…

b) Violation of his right, pursuant to the Fifth Amendment of the United States Constitution, not to be deprived of his liberty without Due Process of Law.

…

d) Violation of his right to Due Process of Law pursuant to Article 1, § 6 of the New York State constitution and the Fourteenth Amendment to the United States Constitution."

(Compl. ¶ 29.)  Plaintiff appears to have abandoned any claim he may have had for deprivation of liberty, as his briefing focuses entirely on deprivation of property.  (See Pl.'s Mem.)

post-deprivation remedy available under state law); Parratt v. Taylor, 451 U.S. 527, 542-43 (1981) (finding negligent deprivation of property not actionable under § 1983 where post-deprivation remedy available), overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986).

Plaintiff argues that "a reasonable-fact finder can establish that the robbery was a result of a policy or custom of the NYPD in failing to train and supervise officers engaging in stop-and-frisk and buy-and-bust investigative activity, *not* a 'random and unauthorized' deprivation," in which case the existence of post-deprivation remedies would not be a bar to his claim.  (See Pl.'s Mem. at 37-39.)  He alternatively argues that he pursued a state law remedy by filing an IAB complaint, but was ignored.  (See id. at 38.)

The type of conduct plaintiff alleges—a robbery—would almost certainly be considered "random and unauthorized," and plaintiff puts forth no evidence to support his assertion to the contrary.  "Where loss of property was 'random and unauthorized,' courts have found that 'New York provides an adequate post-deprivation remedy in the form of state law causes of action for negligence, replevin, or conversion. . . . "  Cantave v. New York City Police Officers, No. 09 CV 2226, 2011 WL 1239895, at *7 (E.D.N.Y. Mar. 28, 2011) (quoting Dove v. City of New York, No. 99 CV 3020, 2000 WL 342682, at *3 (S.D.N.Y. Mar. 30, 2000)); see also Johnson v. City of New York, No. 16 CV 2879, 2019 WL 2393716, at *3 (E.D.N.Y. June 6, 2019); Wahid v. Mogelnicki, 406 F. Supp. 3d 247, 249-50 (E.D.N.Y. 2017).  Plaintiff cites no case law for his assertion that filing an IAB complaint qualifies as pursuing a state law remedy. Accordingly, even if the court were to discern a due process claim from plaintiff's complaint, that claim would fail on the merits.

3.  Failure to Intervene

As an alternative to direct participation, plaintiff brings a failure to intervene claim against Sommer and LaFortune.[15]  Defendants argue that this claim must fail because plaintiff also alleges the officers' direct participation, citing as their sole authority Chepilko v. City of New York, No. 06 CV 5491, 2012 WL 398700 (E.D.N.Y. 2012).  (Defs.' Mem. at 28-29.)  In that case, the court stated in a footnote that, because a particular group of defendants "may be liable under a theory of direct participation, there is no claim against these defendants for failure to intervene."  Chepilko, 2012 WL 398700, at *8 n.5.

Plaintiff asserts that Chepilko is "not the standard" and cites several cases in which courts allowed plaintiffs to proceed to trial on alternative theories of direct participation and failure to intervene.  (Pl.'s Mem. at 38); see also Lanorith v. Truscelli, No. 15 CV 617, 2017 WL 3634600, at *13 (E.D.N.Y. Aug. 22, 2017) ("Defendants further argue for dismissal of the failure to intervene claims, maintaining that a defendant cannot simultaneously be held liable on a theory of direct participation and a theory of failure to intervene. The court rejects this argument. Although a failure to intervene claim cannot ultimately be sustained against a direct participant in the alleged primary violation, Plaintiff is entitled to plead a failure to intervene claim as an alternative to direct liability." (citations omitted)); Buchy v. City of White Plains, No. 14 CV 1806, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015) ("[Defendant] may not be

---

[15] Plaintiff argues that he is entitled to proceed on a failure to intervene claim against all three individual defendants—Sommer, LaFortune, and DiLapi—though the complaint clearly does not allege failure to intervene against DiLapi.  (See Compl. ¶ 31 ("By their conduct and actions in. . . failing to intercede . . . defendants LaFortune, Sommer, Edwards, and John Does 1-4 . . . ).) Moreover, since an officer must, at a minimum, have been present at the scene in order to have failed to intervene, and there is no allegation or evidence that DiLapi was present at the deli, this claim would fail as to DiLapi even if it had been pleaded.  See Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers *in their presence*." (emphasis added)).

held liable both for using excessive force and for failing to prevent the use of excessive force. Plaintiff may, however, hold [defendant] liable for one or the other. The Federal Rules of Civil Procedure recognize claims may be brought in the alternative, even if they are inconsistent. At least one other court in this District has allowed excessive force and failure to intervene claims to proceed in the alternative beyond the summary judgment stage." (citations omitted)); Colon v. City of New York, No. 11 CV 173,  2014 WL 1338730, at *11 (E.D.N.Y. Apr. 2, 2014) ("As the Second Circuit has long held, a plaintiff can proceed to trial on all viable theories of recovery and submit alternative claims to the jury. The Court will permit Plaintiffs to present all viable theories of recovery to the jury." (citations omitted)).

Plaintiff is correct that Chepilko is an outlier.  The majority of cases addressing this issue permitted alternative direct participation and failure to intervene claims to proceed beyond the summary judgment stage (and I would, too).  See Polanco v. City of New York, No. 14 CV 7986, 2018 WL 1804702, at *9 (S.D.N.Y. Mar. 28, 2018) (collecting cases).  However, the issue is ultimately moot because the direct participation claims fail.  See Matthews v. City of New York, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012) (noting that failure to intervene claims are "contingent upon the disposition of the primary claims underling the failure to intervene claim").  Accordingly, plaintiff cannot raise a triable issue of fact with respect to his failure to intervene claims.

### 4.  Conspiracy

Plaintiff additionally brings a § 1985 conspiracy claim against LaFortune, Sommer, and DiLapi, alleging that they "colluded to sabotage the IAB investigation in order to cover up the participation of LaFortune and Sommer."  (Defs.' Mem. at 25.)  Defendants argue that this claim fails for three reasons: (1) it is insufficiently pleaded; (2) it lacks supporting evidence in the record; and (3) it is precluded by the intra-corporate conspiracy doctrine.  (Id.)

27

Plaintiff does not address the conspiracy claim at all in his opposition brief.  (See Pl.'s Mem.)  Accordingly, it is within the court's discretion to deem the conspiracy claim abandoned and grant summary judgment in defendants' favor with respect to that claim.  See Hyek v. Field Support Servs., 702 F. Supp. 2d 84, 102-03 (E.D.N.Y. 2010) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (quoting Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (collecting cases)).

Even if the court were to consider the conspiracy claim on the merits, it would fail.  In order to establish conspiracy to violate civil rights under § 1985, a plaintiff must show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Robinson v. Allstate Ins. Co., 508 F. App'x 7, 9 (2d Cir. 2013) (internal quotation marks and citation omitted).  In making this showing, a plaintiff must point to evidence in the record that the conspiracy was "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus[.]"  Britt v. Garcia, 457 F.3d 264, 270 n.4 (2d Cir. 2006) (internal quotation marks and citation omitted).  The plaintiff must also "provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end."  Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks and citation omitted).

In this case, not only has plaintiff put forth no evidence of a meeting of the minds, but there is record evidence to the contrary—DiLapi testified at his deposition that he does not

know and has never spoken to either Sommer or LaFortune.  (See Salvatore DiLapi Deposition

Transcript, dated Nov. 7, 2019, Dkt. No. 127-18, at 22:10-20.)  Meanwhile, Sommer and

LaFortune each testified that they do not know DiLapi and have never spoken to him about this

case.  (See Steve LaFortune Deposition Transcript, dated Oct. 30, 2019, Dkt. No. 127-19, at

87:6-19; William Sommer Deposition Transcript, dated Oct. 30, 2019, Dkt. No. 127-20, at 72-3-

11.)  For this reason, among others, the conspiracy claim fails.

     5.   Municipal Liability

     Plaintiff purports to have brought a municipal liability claim against the City.

However, while the complaint names the City as a defendant, it does not include a claim for

municipal liability, nor does it contain any factual allegations that would support such a claim.

Since a municipality cannot be held liable under § 1983 on the basis of *respondeat superior*,

Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 691 (1978), the City

argues that this claim should be dismissed.  (See Defs.' Mem. at 29-31.)

     Plaintiff claims that, because defendants' argument is made under the motion to

dismiss standard, it should be disregarded.  (Pl.'s Mem. at 31 n.7.)  In the alternative, he argues

that he should be permitted to amend his complaint.  (Id.)  Substantively, he argues that a

reasonable fact-finder could conclude that the City had a policy or custom of failing to train its

officers involved in stop-and-frisk and buy-and-bust operations.[16]  (Id.)  This argument appears

to be based on the premise that, because these two investigative techniques resemble what

happened to him, the City's purported failure to train its officers with respect to these techniques

could additionally result in liability for his robbery.  (See id. at 31-36.)  At times (and despite

---

[16] A buy-and-bust operation is an investigative technique akin to a controlled buy—undercover
officers attempt to buy drugs from a dealer and, if successful, arrest the dealer once the sale is
completed.  (See Pl.'s Mem. at 10.)

repeatedly referring to what happened to him as a robbery), he also seems to imply that what happened may not have been a robbery at all, but was instead an actual stop and frisk or buy-and-bust operation that went too far.  (See id.)  As evidence, he relies heavily on case law, studies, statistics, and news articles about stop-and-frisk,[17] as well as the fact that the robbery took place in 2011, the height of stop-and-frisk in New York City.  (Id. at 32.)  He also relies on settlement data to assert that there have been "hundreds" of cases like his.  (Id. at 35.)

As a threshold issue, if plaintiff is unable to proffer admissible evidence that the men who robbed him were in fact New York City police officers, then he cannot maintain a claim for municipal liability.  Moreover, and setting aside the fact that plaintiff never pleaded municipal liability in the first place, he cites to no evidence in the record that would support a failure to train claim.[18]  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," Connick v. Thompson, 563 U.S. 51, 61 (2011), and a failure to train will trigger municipal liability "only where the failure to train amounts to deliberate indifference to the rights" of individuals with whom the officers will come in contact, City of Canton v. Harris, 489 U.S. 378, 388 (1989).  The Second Circuit has described three requirements for showing that a failure to train rises to the level of deliberate indifference:

---

[17]  I note that these articles are inadmissible hearsay that cannot be considered on a motion for summary judgment.  See Glowczenski v. Taser Int'l, Inc., 928 F. Supp. 2d 564, 572 (E.D.N.Y. 2013) ("A published article is hearsay. . . . [T]he potential establishment of the articles at trial as reliable authorities does not make them admissible as evidence on the current motion for summary judgment."), aff'd in part, dismissed in part, 594 F. App'x 723 (2d Cir. 2014); Outerbridge v. City of New York, No. 13 CV 5459, 2015 WL 5813387, at *4 (S.D.N.Y. Sept. 30, 2015) ("It is well-established that newspaper articles offered for the truth of the matters asserted therein are inadmissible hearsay that may not be considered by the Court in deciding a motion for summary judgment." (internal quotation marks, citation, and footnote omitted)).

[18] According to defendants, plaintiff has not conducted any Monell discovery.  (See Defs.' Mem. at 30.)

> First, to reach the jury, the plaintiff must offer evidence from
> which a reasonable jury could conclude that a policy-maker knows
> to a moral certainty that her employees will confront a given
> situation. Next, the plaintiff must show that the situation either
> presents the employee with a difficult choice of the sort that
> training or supervision will make less difficult or that there is a
> history of employees mishandling the situation. Finally, the
> plaintiff must show that the wrong choice by the city employee
> will frequently cause the deprivation of a citizen's constitutional
> rights. In addition, at the summary judgment stage, plaintiffs must
> identify a specific deficiency in the city's training program and
> establish that that deficiency is closely related to the ultimate
> injury, such that it actually caused the constitutional deprivation.

Green v. City of New York, 465 F.3d 65, 80-81 (2d Cir. 2006) (quoting Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir.1992); Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (internal quotation marks omitted).

"A pattern of misconduct, while perhaps suggestive of inadequate training, is not enough to create a triable issue of fact on a failure-to-train theory." Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 440 (2d Cir. 2009) (citing Amnesty Am., 361 F.3d at 130). Rather, "[t]he plaintiff must offer evidence to support the conclusion that the training program was inadequate, not '[t]hat a particular officer may be unsatisfactorily trained' or that 'an otherwise sound program has occasionally been negligently administered,' and that a 'hypothetically well-trained officer 'would have avoided the constitutional violation." Id. at 440-41 (quoting City of Canton, 489 U.S. at 390-91).

In this case, plaintiff has cited to no evidence whatsoever as to the training program that he alleges to be deficient. Instead, he combines speculation with statistics to try to build a circumstantial case for municipal liability. This is insufficient to meet his evidentiary burden to proceed past summary judgment on a failure to train claim.

6. State Law Claims

31

Finally, plaintiff brings state law claims for negligent infliction of emotional distress and various violations of the New York Constitution.  Defendants urge the court to decline to exercise supplemental jurisdiction over these claims if the federal claims are dismissed.  (Defs.' Mem. at 31.)  Plaintiff argues that, even if the federal claims are dismissed, the court should retain jurisdiction due to the length of time this case has been pending and the advanced stage of the litigation.  (Pl.'s Mem at 38-39.)

  **i.  *NIED***

In order to prevail on a claim of negligent infliction of emotional distress ("NIED") under New York law, a plaintiff must show "(1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress." Truman v. Brown, 19 CV 1546, 2020 WL 353615, at *15 (S.D.N.Y. Jan. 21, 2020) (internal quotation marks and citation omitted).  In evaluating whether conduct is extreme and outrageous, New York courts apply the same standard as in intentional infliction of emotional distress cases, requiring conduct to be "so outrageous and extreme as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" in order to find liability.  Shukla v. Deloitte Consulting LLP, No. 19 CV 10578, 2020 WL 3181785, at *13 (S.D.N.Y. June 15, 2020) (internal quotation marks and citation omitted).

In addition to these three elements, an NIED plaintiff must establish liability under one of three theories: (1) a bystander theory, (2) a direct duty theory, or a (4) special circumstances theory.  Id. (citing Truman v. Brown, 2020 WL 353615, at *15; see also Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir. 2000)).  Under the bystander theory, a plaintiff must show that "(1) [he or] she [was] threatened with physical harm as a result of defendant's negligence; and (2) consequently [he or] she suffer[ed] emotional injury from witnessing the death or serious

bodily injury of a member of her immediate family." <u>Mortise v. United States</u>, 102 F.3d 693, 696 (2d Cir. 1996).  Under the direct duty theory, a plaintiff must show that he or she "suffer[ed] an emotional injury from defendant's breach of a duty which unreasonably endangered [his or] her own physical safety." <u>Id.</u> (citation omitted).  Finally, under the special circumstances theory, a plaintiff may recover where there is "an especial likelihood of genuine and serious mental distress, arising from . . . special circumstances, which serves as a guarantee that the claim is not spurious." <u>Dorfman</u>, 239 F.3d at 421 (internal quotations and citation omitted).  Examples of special circumstances that have resulted in liability for NIED include a hospital negligently informing an individual that her parent had died, a negligent misdiagnosis of HIV, and a mishandling of a loved one's remains.  <u>Truman</u>, 2020 WL 353615, at *16.

As a threshold matter, plaintiff's complaint does not meet the pleading standard for NIED, which requires a plaintiff to plead facts making out one of the three theories.  <u>Shukla</u>, 2020 WL 3181785, at *13.  Moreover, while his NIED briefing focuses entirely on the allegation that DiLapi was negligent in conducting the IAB investigation, the complaint does not allege NIED against DiLapi at all; rather it alleges NIED only against Sommer and LaFortune, who are accused of acting intentionally.[19]  Even assuming plaintiff had properly stated an NIED claim against DiLapi, that claim would fail as a matter of law.  While plaintiff does not state which of the three theories of NIED liability he is proceeding under, the direct duty theory is the only one that could possibly apply on these facts.  Under that theory, plaintiff would have to show that

---

[19] While it is unclear if plaintiff is still pursuing this claim against Sommer and LaFortune, it fails to the extent that they are only alleged to have acted intentionally, not negligently.  <u>See</u> <u>Lozada v. Weilminster</u>, 92 F. Supp. 3d 76, 107 (E.D.N.Y. 2015) ("While Plaintiff is generally permitted to plead different causes of action in the alternative, other District Courts in this Circuit have held that when a plaintiff's factual allegations are only consistent with a theory of intentional, or perhaps reckless, conduct, negligence claims must be dismissed." (internal quotation marks omitted) (collecting cases)).

DiLapi's purported negligence unreasonably endangered his physical safety.  Since the IAB investigation took place *after* the only event at issue in this case that could possibly have endangered his safety—the robbery—the claim fails as a matter of law.

### ii.  *New York Constitutional Claims*

Plaintiff brings claims under Article I, §§ 5, 6, 8, 11, and 12 of the New York Constitution.  Several of these provisions have no applicability whatsoever to the allegations in this case and plaintiff makes no attempt to explain why they are relevant.  For example, Article 1 § 5 has to do with excessive bail, cruel and unusual punishment, and the detention of witnesses; Article 1 § 8 concerns freedom of speech; and Article 1 § 11 has to do with equal protection. (See N.Y. CONST., Art. 1, §§ 5, 8, 11.)

The only two provisions that could be relevant to this case are Article 1 § 6 (due process) and Article 1 § 12 (unreasonable searches and seizures).  However, claims under these provisions turn on the same issues of identification as plaintiff's analogous federal constitutional claims.  Plaintiff therefore fails to raise a genuine issue of triable fact with respect to these claims.

### CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted.

SO ORDERED.

/s/
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
August 09, 2021